## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| REINALDO RIVERA,<br><br>     Plaintiff,<br><br> v.<br><br>NATIONSTAR MORTGAGE, LLC<br><br>     Defendant. | Case No. 3:17-cv-00049-JBA<br><br><br><br>April 24, 2017 |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Plaintiff Reinaldo Rivera submits this memorandum in opposition to defendant Nationstar Mortgage LLC's 12(b)(6) and 12(b)(7) motion to dismiss Mr. Rivera's First Amended Complaint ("FAC"). Mr. Rivera's complaint states factually supported and legally cognizable claims for relief under Connecticut state law, as well as under the Real Estate Settlement Procedures Act ("RESPA") and the Fair Debt Collection Practices Act ("FDCPA"). Mr. Rivera accordingly requests that the Court deny Nationstar's motion to dismiss.

## <u>TABLE OF CONTENTS</u>

STATEMENT OF FACTS ................................................................................................. 1

ARGUMENT ................................................................................................................... 3

   I. Legal Standard for a 12(b)(6) Motion to Dismiss .................................................. 3

   II. Nationstar Breached the Permanent HAMP Loan Modification Contract Between Itself and Mr. Rivera When It Unilaterally Rescinded the Modification in January 2014 ......................... 3

   III. Mr. Rivera Sufficiently Alleged a Promissory Estoppel Claim Against Nationstar ............. 6

   IV. Mr. Rivera Sufficiently Alleged a Negligence Claim Against Nationstar .......................... 8
      1.     Nationstar Owes a Duty of Care to Mr. Rivera .............................................. 8
       A.  Public Policy Favors Recognizing Nationstar's Duty .................................. 10
       B.  The Authority Nationstar Relies on to Show a Lack of Duty Is Flawed or Inapposite 11
      2.     Mr. Rivera Has Not Brought a Claim Under the Freddie Mac Single-Family Seller/Servicer Guide ................................................................................ 13

   V.  Mr. Rivera Sufficiently Alleged a CUTPA Claim Against Nationstar .............................. 14

      1.     Mr. Rivera Adequately Alleged that Nationstar's Conduct Violates CUTPA ............. 14
      2.     Nationstar's Argument that There Is No Duty to Modify a Mortgage Is Superfluous 15
      3.     Mr. Rivera's CUTPA Claim Does Not Violate Public Policy ..................................... 16

   VI. Mr. Rivera Sufficiently Alleged an NIED Claim Against Nationstar ............................... 18

   VII. Mr. Rivera Sufficiently Alleged an FDCPA Claim Against Nationstar ........................... 21

   VIII. Mr. Rivera Sufficiently Alleged a RESPA Claim Against Nationstar ............................ 23

   IX. Mr. Rivera's CUTPA, Negligence, NIED, and FDCPA Claims Are Timely .................... 26

      1.     Mr. Rivera Has Sufficiently Pled That the Continuing Course of Conduct Doctrine Tolls the Statute of Limitations for CUTPA Violations ......................................... 27
      2.     Mr. Rivera Has Sufficiently Pled That the Continuing Course of Conduct Doctrine Tolls the Statute of Limitations for his Negligence and NIED Claims.................................. 30
      3.     Mr. Rivera's FDCPA Claim Is Within the Applicable Statute of Limitations ........... 32

   X. Mr. Rivera Can Rely on Nationstar's Behavior During the Court-Supervised Foreclosure Mediation Process to Support his Claims .................................................................. 33

   XI. Corrie Rivera is Not a Necessary Party to This Action ............................................... 36

      1.     Even If the Court Finds That She Is a Necessary Party, Nationstar's Motion to Dismiss Must Be Denied Because Joinder Is Feasible ....................................................... 38

CONCLUSION ................................................................................................................ 39

**STATEMENT OF FACTS**

In 2010, Mr. Rivera divorced Corrie Rivera and obtained primary custody of his three children. FAC ¶ 9. Soon after, he lost his job and fell behind on his mortgage payments. *Id*. Nationstar subsequently commenced foreclosure on him, an action that threatened to uproot him and his children from their family home of nearly 15 years. *Id*. at ¶ 15.[1]

In August 2013, Nationstar offered Mr. Rivera a trial loan modification under the federal Home Affordable Modification Program ("HAMP"). Nationstar's "trial plan" stated that, if Mr. Rivera made three monthly payments, it would permanently modify his loan. *Id*. at ¶ 16. After he made his October and November trial payments over the phone, Nationstar mailed Mr. Rivera a permanent modification contract. The contract stated that so long as Mr. Rivera made his three payments and Nationstar accepted and returned the agreement, his loan would become "automatically modified on December 1, 2013 (the 'Modification Effective Date')" and "the first modified payment [would] be due on January 1, 2014." *Id*. at ¶ 20; *id*. Ex. C ¶ 3. Mr. Rivera returned a signed contract to Nationstar on November 26, 2013. *Id*. at ¶ 19. Without authorization or apparent reason, Nationstar attempted to debit Mr. Rivera's bank account for the final trial payment on December 5, 2013. This payment was returned and cost Mr. Rivera overdraft fees. *Id*. at ¶ 21. However, on December 13, 2013, Nationstar nonetheless countersigned, processed, and returned Mr. Rivera's permanent HAMP modification agreement. *Id*. at ¶ 22.

---

[1] As public records show, Reinaldo and Corrie Rivera divorced in January 2010. *See Reinaldo Rivera v. Corrie A. Rivera*, No. NNI-FA09-4012216-S (Conn. Super. Ct. 2009). In addition, public land records show that Corrie Rivera quit claimed the property to Mr. Rivera in February 2010. *See* Exhibit A. Finally, bankruptcy records demonstrate that Corrie Rivera filed Chapter 7 bankruptcy in March 2014, received a discharge with respect to the loan at issue in this case, and accordingly maintains no liability for that loan. *See In re Corrie Rivera*, 14-BK-30488 (Bankr. D. Conn. 2014). "A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation but rather to establish the fact of such litigation and related filings." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

Believing that he should still make his final trial payment, Mr. Rivera called Nationstar in mid-December and tendered his payment over the phone. *Id.* at ¶ 25. Nationstar *refused to accept* Mr. Rivera's proffered payment and assured Mr. Rivera he did not need to make any more payments until January 2014. *Id.* During the call, Nationstar "instruct[ed] Mr. Rivera that his permanent modification would be effectuated without a third trial plan payment" and promised him that the "permanent loan modification was complete, that no further trial payments were due, and that [it] would begin accepting [his] modified payments in January 2014." *Id.* at ¶¶ 53, 57. Yet when Mr. Rivera called Nationstar in January 2014 to start making payments—his first communication with Nationstar since the mid-December call—Nationstar informed him that it had already rescinded his permanent modification because of a "default." *Id.* at ¶ 27. Nationstar then withdrew its foreclosure action and did not communicate with Mr. Rivera again until June 2014, when it brought a second foreclosure action against him. *Id.* at ¶¶ 29-31.

In October 2014, Mr. Rivera and Nationstar began participating in the Superior Court's Foreclosure Mediation Program ("FMP"). Mr. Rivera hoped that their participation in the FMP would result in Nationstar either reinstating his permanent HAMP modification or efficiently evaluating him for further home retention options. *Id.* at ¶ 32. Nationstar did neither. Instead, Nationstar used Mr. Rivera's alleged prior "default" on the trial plan as a reason to deny him modification options, despite being informed by the court mediator at least four times that Nationstar—not Mr. Rivera—had failed to honor the permanent loan modification. *Id.* at ¶ 67. Moreover, Nationstar failed to review Mr. Rivera for a limited-time principal reduction modification for which he was almost certainly eligible. *Id.* at ¶¶ 68-70. These and other negligent acts by Nationstar caused Mr. Rivera—a single father trying to raise three children virtually on his own—severe stress. This stress manifested in increased blood pressure and a

series of emergency room visits, including a weekend stay at Hartford Hospital in December 2016. *Id*. at ¶¶ 101-12. Mr. Rivera explained this misconduct to Nationstar in a December 2016 Qualified Written Request ("QWR") and requested relief, but Nationstar failed to conduct a reasonable investigation into the allegations raised by Mr. Rivera in his QWR. *Id*. at ¶¶ 124-29.

On January 11, 2017, Mr. Rivera filed a Complaint in this Court and, on March 9, 2017, he filed a First Amended Complaint. The FAC stated the following claims based on Nationstar's actions: (1) Breach of Contract; (2) Promissory Estoppel; (3) Negligence; (4) Negligent Infliction of Emotional Distress; (5) Violations of Connecticut Unfair Trade Practices Act ("CUTPA"); (6) Violations of Fair Debt Collection Practices Act ("FDCPA"); and (7) Violations of Real Estate Settlement Procedures Act ("RESPA"). Nationstar filed its motion to dismiss on March 22, 2017.

## ARGUMENT

### I. Legal Standard for a 12(b)(6) Motion to Dismiss

In evaluating a 12(b)(6) motion to dismiss, all material factual allegations in the complaint must be accepted as true, and the court must draw all reasonable inferences in the plaintiff's favor. *See Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Velez v. Levey*, 401 F.3d 75, 80 (2d Cir. 2005). The factual allegations must go beyond a merely speculative level and assert a cause of action with "enough facts to state a claim for relief that is plausible on its face." *Biro*, 807 F.3d at 544 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### II. Nationstar Breached the Permanent HAMP Loan Modification Contract Between Itself and Mr. Rivera When It Unilaterally Rescinded the Modification in January 2014

Less than one month after executing a permanent HAMP loan modification with Mr. Rivera, Nationstar breached the contract by unlawfully rescinding the modification. Nationstar

argues now that Mr. Rivera did not perform on the HAMP contract because he "failed to make" the final trial plan payment and that Nationstar therefore did not breach the HAMP contract. Def. Mot. Dismiss 22. Nationstar's argument fails to take the facts as alleged and makes assertions more fit for an answer or a motion for summary judgment than a motion to dismiss. Because Mr. Rivera alleged that he performed on the contract, that Nationstar breached the contract without justifiable cause, and that he suffered extensive damages as a result of Nationstar's breach, the Court should not dismiss Mr. Rivera's breach of contract claim.

The elements for a breach of contract claim are (i) formation of an agreement, (ii) performance by one party, (iii) breach of the agreement by the other party, and (iv) damages. *Meyers v. Livingston, Adler, Pulda, Meiklejohn, and Kelly P.C.*, 311 Conn. 282, 291 (2014); *see also Martin v. Dupont Flooring Systems, Inc.*, No. Civ.A. 301-CV-2189 SRU, 2004 WL 726903, at *3 (D. Conn. 2004) (breach of contract is "unjustified failure to perform all or any part of what is promised in a contract").

Mr. Rivera plausibly alleged his performance and Nationstar's breach. The HAMP contract stated that if (a) Mr. Rivera made his trial plan payments, (b) if the modification effective date of December 1, 2013 passed, and (c) if Nationstar signed and returned the contract, Mr. Rivera's loan would become "automatically become modified on December 1, 2013" and "the first modified payment [would] be due on January 1, 2014." FAC, Ex. C § 3. The contract did not grant Nationstar unlimited discretion to claim non-performance on Mr. Rivera's part, or to refuse to modify Mr. Rivera's loan as of December 1, 2013. Nationstar claims that Mr. Rivera did not make his final trial plan payment in December 2013, but Mr. Rivera plausibly alleged that he tendered that payment and thus fully performed on the contract. *Id*. at ¶ 25.

When a party is trying to recover on a breach of contract claim, tendered performance is as good as consummated performance. *See David M. Somers and Associates, P.C. v. Busch*, 283 Conn. 396, 406 (2007) (stating that a party can recover on a breach of contract claim if he has "fully performed his own obligation under it, *has tendered performance*, or has some legal excuse for not performing") (emphasis added); *see also Hudson United Bank v. Cinnamon Ridge Corp.*, 81 Conn. App. 557, 583 (2004) (defining tender as "as an unconditional offer of payment consisting in the actual production of a sum not less than the amount due on a specific debt or obligation"). Nationstar refused to accept Mr. Rivera's tendered payment. *Id.* at ¶ 25; *19 Perry St, LLC v. Unionville Water Co.*, 294 Conn. 611, 628 (2010) (noting that the "formal production" of tender is "excused . . . by an unequivocal declaration that it will not be received"). Nationstar then rescinded the contract in early January 2014 without contacting Mr. Rivera or giving him a chance to re-tender his final trial payment. Mr. Rivera only discovered the contract had been rescinded when he called to begin making his January mortgage payments. *Id.* at ¶ 27; *see also* Restatement (First) of Contracts § 312 ("a breach . . . may take place by failure to perform acts promised . . . or by repudiation"). Mr. Rivera thus properly alleged a breach of contract claim.

Nationstar's assertions are more fit for an answer or a motion for summary judgment than a motion to dismiss. For instance, Nationstar makes much of its unauthorized attempt to debit Mr. Rivera's account on December 5, 2013. *See* FAC ¶ 21. Nationstar uses this debiting to contend that it refused to accept Mr. Rivera's tendered final payment in mid-December 2013 because it "appeared to [Nationstar] that [Mr. Rivera had already] complied with the obligations of the [Trial Payment Plan]." Def. Mot. Dismiss 21. But that is not what Mr. Rivera alleged. Mr. Rivera alleged that he tendered the final trial payment and that Nationstar then refused the payment and instructed him that he did not need to make any more payments because his

modification was complete. *See* FAC ¶¶ 25, 53. Nationstar also claims that it "first became aware" of Mr. Rivera's insufficient December 5 payment on January 3, 2014 and that Mr. Rivera "chose to remain silent" with respect to his third trial payment. Def. Mot. Dismiss 22-23. In making these characterizations, Nationstar relies on the account history that Mr. Rivera attached to his complaint. *See* FAC, Ex. D. From the face of the account history, though, it is not clear what Nationstar knew and when it knew it. As of now, Nationstar's arguments stray outside the four corners of the complaint and are inappropriate for a motion to dismiss.

Nationstar also contends that Mr. Rivera did not suffer damages because "any alleged harm resulted from [Mr. Rivera's] own default on the underlying . . . mortgage . . . and HAMP modification." Def. Mot. Dismiss 23. While Mr. Rivera was behind on his mortgage payments, Nationstar's breach of contract caused Mr. Rivera to incur more damages than his default otherwise caused. In other words, he slid deeper into debt, stress, and illness than he would have had Nationstar performed on its obligations. *See* FAC ¶ 54. When Nationstar sought to foreclose on Mr. Rivera in June 2014, Nationstar described its breach as Mr. Rivera's "default," and then used this "default" to curtail Mr. Rivera's ability to save his home. Although Nationstar eventually offered Mr. Rivera a new trial modification, this new modification offers far worse terms than the HAMP modification, and does not account for emotional and other damages that Mr. Rivera suffered between January 2014 and the present. *Id*. at ¶ 40.

### III. Mr. Rivera Sufficiently Alleged a Promissory Estoppel Claim Against Nationstar

Mr. Rivera has also adequately pled facts to support a promissory estoppel claim. To prove a promissory estoppel claim, a party must show that: (1) the party against whom estoppel is asserted "said or did something calculated or intended to induce another party to believe that certain facts exist and to act on that belief," and (2) the other party, in reliance on those facts,

changed its position, thereby incurring injury. *Chotkowski v. State*, 240 Conn. 246, 268 (1997).

"[W]hether a representation rises to the level of a promise is generally a question of fact, to be

determined in light of the circumstances under which the representation was made." *Stewart v.*

*Cendant Mobility Services Corp.*, 267 Conn. 96, 106 (2003).

Mr. Rivera's allegations meet this standard. He alleged that Nationstar informed him in

mid-December 2013 that his modification was complete, that no further trial payments were due,

and that it would begin accepting his modified payments in January 2014. FAC ¶ 57. This

promise, which involved explicit dates and specific commands, was "sufficiently clear and

definite such that [Mr. Rivera's] reliance on [it] was reasonable." *Stewart*, *supra*, 267 Conn. at

108. "Although the promise must be clear and definite, it need not be the equivalent of an offer

to enter into a contract because the 'prerequisite for . . . application of the doctrine of promissory

estoppel is a *promise* and not a bargain and *not* an *offer.*'" *Id.* at 105 (emphasis in original); *see*

*also Markey v. Ditech Financial LLC*, No. 3:15-cv-1711, 2016 WL 5339572, at *3 (MPS) (D.

Conn. 2016) (finding bank's promise to modify loan and halt foreclosure proceedings

sufficiently clear and definite on motion to dismiss).[2] Mr. Rivera also alleged that, had

Nationstar not made this promise, he would have made the payment in December and would

have continued to communicate with Nationstar to ensure that his modification would go

through. FAC ¶ 60. Mr. Rivera therefore suffered substantial injury as a result of his reliance on

Nationstar's broken promise. *Id.* at ¶ 64.

---

[2] Moreover, courts have held that oral promises may form the basis of a promissory estoppel claim even if the oral promise involved an agreement that would normally fall within the statute of frauds. *See, e.g.*, *Benedetto v. Wanat*, 79 Conn. App. 139, 151 (2003) (real estate developer failed to honor its oral promise to return a $100,000 deposit if the plaintiff could find a replacement tenant); *East River Energy, Inc. v. Gaylord Hospital, Inc.*, No. NNH-CV09-5029078-S, 2011 WL 3198251, at *6-*10 (Conn. Super. Ct. 2011) (hospital failed to honor its oral promise to purchase $667,000 of heating oil from the plaintiff).

Nationstar's only argument for dismissing Mr. Rivera's promissory estoppel claim is that Mr. Rivera "cannot show his performance under the TPP." *See* Def. Mot. Dismiss 23. Since this argument does not address the elements of promissory estoppel, the Court should disregard it.

## IV. Mr. Rivera Sufficiently Alleged a Negligence Claim Against Nationstar

Mr. Rivera has also adequately pled a cognizable claim of mortgage servicer negligence. "Negligence occurs where one under a duty to exercise a certain degree of care to avoid injury to others fails to do so." *Dean v. Hershowitz*, 119 Conn. 398, 407-08 (1935). The elements of negligence are: (1) duty, (2) breach, (3) causation, and (4) injury. *See RK Constructors, Inc. v. Fusco Corp.*, 231 Conn. 381, 383 (1994). Mr. Rivera alleged facts sufficient to support his claim that Nationstar negligently breached its duty of care to Mr. Rivera as his servicer, and that this breach caused him injury.

### 1. Nationstar Owes a Duty of Care to Mr. Rivera

As a mortgage servicer, Nationstar assumed a duty when it solicited a loan modification application from Mr. Rivera; a duty to review the application with reasonable diligence and due care. Also, when Mr. Rivera filed for participation in the Superior Court's specialized mediation process, Nationstar had a duty to participate in the process in good faith.

The test for the existence of a legal duty of care entails "(1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, [of] whether the defendant's responsibility for its negligent conduct should extend to the particular consequences of particular plaintiff in the case." *Cannizzaro v. Marinyak*, 312 Conn. 361, 366 (2014) (internal quotation marks omitted). When deciding whether public policy favors a duty of care, courts consider four factors: "(1) the normal expectations of the participants in the activity under review; (2) the

public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoidance of increased litigation; and (4) the decisions of other jurisdictions." *Ruiz v. Victory Properties, LLC*, 315 Conn. 320, 337 (2015). Holding that a duty of care exists between a mortgage servicer and borrower where the servicer solicits a loan modification application from the borrower accords with all of these factors, and, indeed, multiple Connecticut judges have held as much. *See, e.g.*, *Bank of America v. Izzo*, No. NNH-CV10-6009112-S, 2015 WL 4643238, at *2 (Conn. Super. Ct. 2015) (upholding negligence claim arising out of breached modification agreement); *Chacon v. Ocwen Loan Servicing, LLC*, No. NNH-CV15-6054564-S (Conn. Super. Ct. 2015) (*See* Exhibit B) (upholding negligence claim arising out of failure to timely review modification applications and to provide accurate information); *Hansen v. Wells Fargo Bank*, No. FBT-CV14-6042087-S (Conn. Super. Ct. 2014) (*See* Exhibit C) (upholding negligence claim arising out of material misrepresentations during modification process).[3]

A duty of care exists in this case because Mr. Rivera alleged harms that any reasonable servicer could anticipate would result from its actions. *See* FAC ¶ 79. Mr. Rivera alleged that Nationstar failed to engage in conduct consistent with the objectives of the Foreclosure Mediation Program, *id.* at ¶ 67a, failed to correct an error that had been brought to its attention, *id.* at ¶ 67b, and erroneously refused to review Mr. Rivera for loss mitigation options for which

---

[3] Superior Court judges have sustained borrowers' claims of negligence against their mortgage servicers in other contexts as well. *See, e.g.*, *Cosme v. Bank of America*, No. TTD-CV14-6007738-S, 2014 WL 5472123 (Conn. Super. Ct. 2014) (servicer was negligent in providing status about loan at issue); *MTGLQ Investors LP v. Baron*, 2010 WL 4722131, at *2 (Conn. Super. Ct. 2010) (allowing claim for negligence arising out of servicer's property management tactics); *EMC Mortgage Corporation v. Shamber*, No. CV07-5001252-S, 2009 WL 4282900, at *9-*10 (Conn. Super. Ct. 2009) (permitting negligence claim based on failure to adhere to RESPA mortgage servicing rules); *Argent Mortgage v. Wyrick*, No. CV05-4015105, 2007 WL 1053412, at *4 (Conn. Super. Ct. 2007) (rejecting mortgagee's argument that mortgage servicer owed no duty of care to borrower regarding insurance policy on home); *People's Bank v. Perkins*, No. CV 310482, 1994 WL 621969, at *4 (Conn. Super. Ct. 1994) (permitting borrower's negligence counterclaim against mortgagee for negligent accounting and computation of interest).

he was eligible, *id*. at ¶¶ 67d, 68. Nationstar knew or should have known that failing to properly consider its customers for loan workout programs would result in damages, economic loss, lost opportunities to achieve a favorable workout, and emotional distress. *Id.* at ¶ 80.

### A. Public Policy Favors Recognizing Nationstar's Duty

Recognizing that Nationstar owes a duty of care to borrowers who it reviews for loan modification options is consistent with public policy. Indeed, the recent financial crisis has made clear the abuses that consumers suffer as a result of inadequate servicer practices. In response, legislators and regulators have imposed a set of standards to which the industry must adhere, articulating an intent through public policy of protecting homeowners from arbitrary and improper conduct.[4] As the Consumer Financial Protection Bureau (CFPB) noted when promulgating these policies, "[t]he recent financial crisis exposed pervasive consumer protection problems across major segments of the mortgage servicing industry . . . . Existing weaknesses in servicer practices, including inadequate recordkeeping and document management and lack of oversight of service providers, made it harder to sort out borrower problems to achieve optimal results." *2012 Real Estate Settlement Procedures Act (Regulation X) Mortgage Servicing Proposal*, 77 Fed. Reg. 57200 (Sept. 17, 2012) (codified at 12 C.F.R. pt. 1024). This post-crisis policy response resulted in guidelines establishing the care servicers must show their customers.

Additional public policy also favors holding Nationstar accountable for its lack of basic care in servicing Mr. Rivera's loan. Mr. Rivera cites to numerous sources of public policy that recognize servicers' duties to their clients, including the Freddie Mac Single-Family Seller/Servicer Guide, *see* FAC ¶ 73, Connecticut's Uniform Foreclosure Mediation Standing Orders, *see id.* at ¶ 74, Connecticut General Statutes, *see id*. at ¶ 75, the Freddie Mac Principal

---

[4] *See, e.g.*, CFPB mortgage servicing regulations, 12 C.F.R. pt. 1024 (Regulation X) and 12 C.F.R. pt. 1026 (Regulation Z); and Connecticut's Foreclosure Mediation Program, Conn. Gen. Stat. § 49-31k-o (2016).

Reduction Modification Program, *see id*. at ¶ 76, and federal regulations promulgated by the CFPB, *see id.* at ¶ 77. As these sources make clear, holding servicers accountable under the circumstances alleged will not only protect homeowners but also prevent needless costs from being incurred by both homeowners and investors as a result of a poorly managed modification application process. In other words, tort liability will make loss mitigation programs more efficient and effective. Furthermore, there is no evidence that negligence liability would discourage mortgage lending.

Recognizing that servicers have a duty of care to their customers allows homeowners to get relief when they are injured. Moreover, this duty does not increase litigation in a way that public policy disfavors; it merely requires servicers to exercise reasonable care and diligence when negotiating workouts and executing permanent modifications. The many sources cited above demonstrate that public policy now favors holding servicers accountable for carelessness.

Appellate courts in other states have also recognized that mortgage servicers have a duty of care to their customers. *See, e.g.*, *Steinberger v. McVey ex rel. County of Maricopa,* 234 Ariz. 125 (2014); *Alvarez v. BAC Home Loans Servicing, L.P.*, 228 Cal.App.4th 941 (2014). However, despite the Superior Court opinions finding a duty of care in the mortgage servicing context, discussed *supra*, Connecticut appellate courts have yet to rule on the issue.

**B.  The Authority Nationstar Relies on to Show a Lack of Duty Is Flawed or Inapposite**

Nationstar's reliance on *Blanco* and *Southbridge Assocs., LLC v. Garofalo*, 53 Conn. App. 11 (1999), for the proposition that no duty of care exists in this context is misplaced. In *Garofalo*, the Superior Court concluded that no *fiduciary* relationship exists between a bank and its customer through the borrower-lender relationship, and that a bank has a right to further its own interests and is not under a duty to represent the customer's interest. *Id.* at 18-19. E. A

11

lender-borrower relationship is different from the relationship between a mortgage servicer and its customer, where Connecticut courts (and public policy) increasingly recognize a duty of care. Moreover, the other opinion Nationstar cites to, *Blanco*, acknowledged that the common-law duty of care and a duty arising from fiduciary relationship "are not interchangeable duties." *Blanco v. Bank of America*, 2016 WL 2729319, at \*5 (Conn. Super. Ct. 2016) (citing *Sherwood v. Danbury Hospital,* 278 Conn. 163, 196, (2006)). Several other cases to which Nationstar cites are also inapposite as they only deal with instances where plaintiffs alleged a duty based on a fiduciary relationship. *See* Def. Mot. Dismiss 24-25 (collecting cases based on alleged fiduciary relationship).

In *Blanco*, the Superior Court ultimately came to the erroneous conclusion that recognizing a duty of care between mortgage servicers and their customers would frustrate the goal of encouraging loan modifications. Recognizing a duty of care, in that court's view, would mean "[e]ntities in the defendant's position would be less inclined to even entertain loan modification applications, which principally benefit mortgagors." *Blanco*, *supra*, 2016 WL 2729319, at \*6. This conclusion is incorrect for two reasons. First, under the Connecticut Foreclosure Mediation statute, mortgage lenders are required to mediate in good faith. *See* Conn. Gen. Stat. § 49-31k(7). Refusing to consider a borrower for a loss mitigation option without any basis would not comport with this requirement. Second, the court's notion that modifications principally benefit mortgagors is not always the case. Loan modifications are often mutually beneficial to both parties. Since foreclosures usually hurt the investors that hold the mortgage because of the diminished return they receive by paying the foreclosure on, and then selling, a distressed property relative to negotiating a loan workout, lenders should be equally motivated to extend modification options. However, faulty incentive structures and investor restrictions often

preclude such workouts. *See* Maggie Barron & Melanca Clark, Brennan Ctr., *Foreclosures: A Crisis in Legal Representation* 7-8 (2009) (discussing "inceptive misalignment problems" in the mortgage industry).[5] Moreover, *LaPlante v. Vasquez*, 136 Conn. App. 805 (2012)—which Nationstar cites for the proposition that judicial assistance is unnecessary in this context—is similarly inapposite because the legislature has already determined that judicial oversight in the context of mortgage loan modifications is necessary. Therefore, despite the *Blanco* decision, this court should recognize a mortgage servicers' duty to their clients.

Mr. Rivera has not alleged that Nationstar has a fiduciary relationship or that it had a duty to represent his interests. Instead, Mr. Rivera alleged that Nationstar assumed a duty of care when it agreed to review him for loan modification. *See* FAC ¶¶ 71-77. Nationstar accordingly breached its duty of care to Mr. Rivera when it made numerous errors during his loan modification application process, and this breach caused Mr. Rivera substantial harm. *Id*. at ¶¶ 78-80.

### 2.  Mr. Rivera Has Not Brought a Claim Under the Freddie Mac Single-Family Seller/Servicer Guide

Mr. Rivera points to Freddie Mac's rules as evidence of public policy favoring a duty. *See* FAC ¶ 76. Freddie Mac, as the investor, requires its servicers to comply with those rules when working with customers who are behind on their mortgage. *Id*. Nationstar's failure to comply with these rules demonstrates that it cannot claim it is simply doing its job. Moreover, these rules demonstrate that Mr. Rivera's claims do not rely on abstract notions of care; there are industry standards providing an example of, and a baseline for, servicer behavior.

Mr. Rivera, however, is not attempting to *enforce* the rules; he is not seeking any of the remedies for violations of the Guide. Rather, he is seeking damages for negligence. FAC ¶ 80.

---

[5] https://www.brennancenter.org/sites/default/files/legacy/Justice/Foreclosure%20Report/ForeclosuresReport.pdf.

**V.  Mr. Rivera Sufficiently Alleged a CUTPA Claim Against Nationstar**

    **1.  Mr. Rivera Adequately Alleged that Nationstar's Conduct Violates CUTPA**

Mr. Rivera's CUTPA claim satisfies each prong of the "cigarette rule," the standard by which Connecticut courts evaluate CUTPA claims. *Harris v. Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 350 (2010). To satisfy this standard, the practice at issue must (1) offend public policy, (2) be immoral, unethical, oppressive, or unscrupulous, or (3) cause substantial injury to consumers. *Id*. It is not necessary that a practice meet all three criteria to support a finding of "unfairness" under CUTPA, but rather "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Ulbrich v. Groth*, 310 Conn. 375, 409 (2013). Furthermore, a practice is "deceptive" under CUTPA if each of the following are true: "First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material that is likely to affect the consumer's decisions or conduct." *Caldor, Inc. v. Helson*, 215 Conn. 590, 597 (1990) (internal quotation marks and citations omitted). "Thus, a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." *Ramirez v. Health Net of Northeast, Inc.*, 285 Conn. 1, 19 (2008).

Even though alleging a single criterion of the three-prong cigarette rule would suffice, *Glazer v. Dress Barn Inc.*, 274 Conn. 33, 82 (2005), Mr. Rivera has adequately alleged all of these criteria. First, Nationstar's actions offend public policy regarding mortgage servicer conduct. FAC ¶¶ 87-90. Second, Nationstar's actions were immoral, unethical, oppressive, and unscrupulous because it failed to mediate in good faith; subjected Mr. Rivera to the practice of "dual tracking"; attempted to withdraw funds without Mr. Rivera's consent; unilaterally

rescinded a valid and fully-executed modification agreement due to confusion stemming from its own internal errors; failed to correct these errors over the course of several years of mediation sessions; and refused to review Mr. Rivera for loss mitigation options for which he was eligible. *Id.* at ¶¶ 84-85, 91. This conduct was also deceptive and unfair in that, among other things, Nationstar prevented Mr. Rivera from making his final payment under his trial plan because of its own error and then alleged that Mr. Rivera defaulted on the trial plan, and failed to mediate in good faith. *Id.* at ¶ 84. Third, Nationstar's actions and practices caused substantial injury to Mr. Rivera that he could not have reasonably avoided and that was not outweighed by any countervailing benefits to consumers that the conduct provided. *Id.* at ¶¶ 92-93.

In *Walker v. Deutsche Bank Trust*, 2017 WL 1115201, at *3-*4 (AWT) (D. Conn. 2017) and *Drena v. Bank of America*, 2016 WL 730699, at *2-*3 (MPS) (D. Conn. 2016), the courts denied motions to dismiss a CUTPA claim on analogous facts. In *Walker*, the servicer breached modification agreements and mediated in bad faith, and in *Drena* the bank's unauthorized debiting of a modification payment resulted in years of delay before a final mortgage modification was reached. *See also Demattia v. Bank of America*, 2016 WL 4150169, at *12 (Conn. Super. Ct. 2016) (finding adequately pled CUTPA claim in mortgage servicing context). Nationstar's conduct also meets all three prongs of the cigarette rule here.

**2. Nationstar's Argument that There Is No Duty to Modify a Mortgage Is Superfluous**

Nationstar suggests that Mr. Rivera's CUTPA claim fails because "refusing to negotiate a loan modification does not constitute a violation of CUTPA." Def. Mot. Dismiss 30. As with Nationstar's response to Mr. Rivera's negligence claim, this argument is irrelevant. As noted in Part IV.1, *supra*, Mr. Rivera does not allege that Nationstar had a duty to modify his loan, but rather that Nationstar had a duty to participate in the Superior Court's specialized mediation

process in good faith, and that Nationstar assumed a duty to review Mr. Rivera's modification application with reasonable diligence and due care once it agreed to conduct the review.

While Nationstar is correct that in *Blanco v. Bank of America*, No. HHD-CV15-6060162-S, 2016 WL 2729319 (Conn. Super. Ct. 2016), a Superior Court judge concluded that allegations pertaining to the manner in which a servicer reviews a loan modification application are not sufficient to state a CUTPA claim, this is not settled law. At least three other Superior Court judges have upheld CUTPA claims based on servicers' conduct in the course of the modification process. *See, e.g.*, *Izzo*, *supra*, 2015 WL 4643238 (holding that the borrower's CUTPA claim, based on the servicer's conduct during the modification process, was legally sufficient); *Chacon*, *supra*, No. NNH-CV15-6054564S (upholding borrower's CUTPA claim based on servicer's conduct during modification process, including requesting duplicative and unnecessary documents and failing to meet deadlines); *Hansen*, *supra*, No. FBT-CV14-6042087-S (upholding borrowers' CUTPA claim based on servicer's failure to abide by the terms of the National Mortgage Settlement, failure to disclose investor restrictions over the course of two years, and charging borrowers with fees and other charges to which servicer was not entitled). Accordingly, Nationstar's motion to dismiss Mr. Rivera's CUTPA claim should be denied.

### 3. Mr. Rivera's CUTPA Claim Does Not Violate Public Policy

Nationstar contends that allowing Mr. Rivera's CUTPA claim to go forward would violate public policy by "discourag[ing lenders] from engaging in modification and settlement negotiations, lest they incur potential CUTPA liability." Def. Mot. Dismiss 31. This contention lacks merit for two reasons. First, servicers are required by law to participate in modification and settlement negotiations. Second, there is little sense in pursuing the public policy objective of encouraging servicers to engage in modification and settlement negotiations if they are allowed

16

to waste homeowners' time and are not required to display a baseline level of preparation and competence in the course of these negotiations. Instead, public policy favors holding servicers accountable for their incompetence and lack of basic care for homeowners' financial well-being. Sustaining Mr. Rivera's CUTPA claim would advance the public policy goal of promoting mortgage modifications by preventing needless costs from being incurred due to a poorly managed modification application process.

Servicers are required by state law and federal regulations to participate in modification and settlement negotiations. Once a homeowner files for inclusion in the mediation program, the servicer is required to participate. Conn. Gen. Stat. § 49-31n(c)(1). While in mediation, servicers are under a statutory duty to determine "whether or not the parties can reach an agreement that will . . . avoid foreclosure by means that may include consideration of any loss mitigation options available through the mortgagee." Conn. Gen. Stat. § 49-31k(7). The program also entails "an expectation that all parties shall endeavor to reach such determination with reasonable speed and efficiency by participating in the mediation process in good faith, but without unreasonable and unnecessary delays." *Id.*; FAC ¶ 74. Furthermore, federal regulations promulgated by the CFPB require servicers to review loss mitigation applications, 12 C.F.R. § 1024.41(c), accurately respond to claims by borrowers that they had made an error in reviewing loss mitigation applications, 12 C.F.R. § 1024.35(e), and maintain policies and procedures reasonably designed to provide accurate information about loss mitigation options to borrowers, 12 C.F.R. § 1024.38. *See* FAC ¶ 77. Sustaining Mr. Rivera's CUTPA claim is unlikely to discourage servicers from engaging in modification and settlement negotiations out of fear that they may incur CUTPA liability because, if they disengaged, they would likely violate RESPA.

Additionally, homeowners have almost no bargaining power in the modification process, and they have little choice in which company services their loans. When applying for and executing modifications, homeowners must comply with their servicers' wishes. Homeowners are reasonable in expecting, however, that servicers will be diligent when they agree to consider a modification and that servicers will not further damage their financial well-being by being careless with, and unresponsive to, their paperwork and account information.

Furthermore, servicers, who maintain profit margins by keeping costs down, have strong incentives to "stretc[h] out a delinquency without either a modification or a foreclosure" in order to collect additional default-related fees. Diane E. Thompson, "Foreclosure Modifications: How Servicer Incentives Discourage Loan Modifications," 86 Wash. L. Rev. 755, 776-77 (2011). Modifications are also "costly in terms of staff time and skill to implement," and servicers' subsequent reluctance to properly invest in the loss mitigation staffing and training has "undermined efforts to modify loans." *Id.* at 821-22. Resulting delays hurt consumers by trapping them in high-interest mortgages, penalizing them through additional fees, reducing their wages through time lost engaging with servicers, and undermining their mental and physical health.

Because Mr. Rivera plausibly alleged the elements of a CUTPA claim and because holding mortgage servicers accountable for CUTPA violations would not impair public policy, this Court should deny Nationstar's attempt to dismiss Mr. Rivera's CUTPA claim.

## VI. Mr. Rivera Sufficiently Alleged an NIED Claim Against Nationstar

Mr. Rivera has adequately pleaded a claim for negligent infliction of emotional distress (NIED). To state a claim for NIED, a plaintiff must allege that "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress

was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003).

With regard to the first element, Mr. Rivera pleaded that Nationstar created an unreasonable risk of causing the plaintiff emotional distress by, among other things, repeatedly entering his property to photograph his home while he and his children were present; rescinding a permanent HAMP modification it had granted to Mr. Rivera despite his compliance with the terms of the agreement; failing to acknowledge its errors and reinstate Mr. Rivera's wrongfully rescinded HAMP modification despite Mr. Rivera's and a court-appointed mediator's repeated requests to that it do so; failing to effectively and timely review Mr. Rivera's eligibility for other modification options; and failing to mediate in good faith. FAC ¶ 108.

With regard to the second element, Mr. Rivera not only alleged that his emotional distress was "foreseeable," but that a reasonable person would expect the aforementioned conduct by Nationstar to exacerbate Mr. Rivera's risk of emotional distress beyond that which is typically associated with foreclosures. *See* FAC ¶¶ 101-08. Mr. Rivera also alleged that, given Nationstar's "extensive experience servicing delinquent mortgage loans," it should have foreseen that engaging in conduct that increases a homeowner's fear of losing his home and uprooting the lives of his children would exacerbate his emotional distress. *Id.* at ¶ 114. Furthermore, Mr. Rivera alleged that "Nationstar should have also realized that such conduct risked distressing Mr. Rivera to the point at which he might suffer illness or bodily harm." *Id.*

To bolster these allegations, Mr. Rivera submitted two academic studies linking foreclosure-related stress to the onset of physical and mental health problems. *See* FAC, Exs. M-N. Nationstar objects to the inclusion of these reports as hearsay. Def. Mot. Dismiss 28. This

evidentiary objection is inappropriate at this stage of the proceedings. For the purposes of ruling

on a motion to dismiss, courts are "required to accept the material facts alleged in the complaint

as true" and must "consider attachments to the pleadings as included therein." *Austin v. Ford

Models, Inc.*, 149 F.3d 148, 152 (2d Cir. 1998), *abrogated on other grounds by Swiekiewicz v.

Sorema, N.A.*, 122 S. Ct. 992 (2002); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written

instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). Mr. Rivera

attached these reports to the complaint, so, for the purposes of deciding Nationstar's motion to

dismiss, they must be accepted as true.

The third NIED element requires the emotional distress to be "severe enough that it might

result in illness or bodily harm." *Carroll*, *supra*, 262 Conn. at 444. Mr. Rivera pleaded that his

emotional distress resulted in illness and bodily harm including high blood pressure and anxiety

requiring medication. Mr. Rivera also alleged that he had three anxiety attacks that resulted in his

hospitalization and ultimately required further medication. *See* FAC ¶¶ 109-12.

The fourth element requires that "the defendant's conduct was the cause of the plaintiff's

distress." *Carroll*, *supra*, 262 Conn. at 444. Mr. Rivera alleged that his high blood pressure and

anxiety were caused by "his fear of losing his home to foreclosure." FAC ¶ 109-10. He further

pleaded that his anxiety attacks "were triggered by his fear that during [upcoming mediation

sessions] Nationstar would continue to mediate in bad faith and refuse to acknowledge and fix its

mistakes." *Id.* at ¶¶ 111-12.

These allegations all comport with similar situations in which homeowners have

successfully pleaded analogous NIED claims for bank misconduct during the modification

application process. *See Drena v. Bank of America, N.A.*, No. 3:15-cv-00176 (MPS), 2016 WL

730699, at *6 (D. Conn. 2016) ("taking unauthorized funds from a mortgagor who already is

20

struggling to pay his mortgage, and then stringing along the mortgagor for years by repeatedly requesting and repeatedly ignoring the mortgagor's loan-modification paperwork would be severely distressing to a mortgagor in financial straits striving to stay in his home"); *see also Demattia*, *supra*, 2016 WL 4150169, at *6-*7 (upholding plaintiff's NIED claim where plaintiff alleged that his servicer breached a modification agreement because the servicer's "conduct created an unreasonable risk of causing the plaintiff emotional distress . . . [in light of the] rigorous expectation for contractual performance" that the modification agreement created); *Bank of America, N.A. v. Criscitelli*, No. CV13-6038369-S, 2015 WL 5806294, at *5 (Conn. Super. Ct. 2015) (upholding plaintiff's NIED claim where plaintiff alleged that plaintiff reneged on a loan modification for bad faith reasons and commenced a foreclosure).

Nationstar nonetheless argues that Mr. Rivera "does not meet [the required NIED] test and cannot show quantifiable damages caused by Nationstar's alleged conduct." Def. Mot. Dismiss 28. But Nationstar does not specify why Mr. Rivera's claim fails. Mr. Rivera alleged several injuries resulting from Nationstar's conduct that required medical treatment and can be quantified for the purposes of assessing damages. *See* FAC ¶¶ 111-12.

## VII. Mr. Rivera Sufficiently Alleged an FDCPA Claim Against Nationstar

Mr. Rivera has alleged a cognizable FDCPA claim. "To state a claim under the FDCPA, plaintiff must allege that [he] is a 'consumer,' [and] that defendants are 'debt collectors' . . . ." *Remington v. Fin. Recovery Servs., Inc.*, No. 3:16-cv-865 (JAM), 2017 WL 1014994, at *3 (D. Conn. 2017) (citing *Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191, 194 (2d Cir. 2015)). Neither of these points are contested by Nationstar. Furthermore, Mr. Rivera alleged Nationstar's debt collection practices were "unfair or unconscionable" in violation of 15 U.S.C. § 1692f, particularly its repeated failure to review him for a program for which he was eligible

and that would have reduced his debt, and to correct its numerous servicing errors. *See* FAC ¶ 118.

Nationstar argues that Mr. Rivera's FDCPA claim should be dismissed because it does not allege any of the examples listed in 15 U.S.C. § 1692f. But this list is not exhaustive: "The FDCPA sets forth examples of particular practices that debt collectors are forbidden to employ. The list, however, is non-exhaustive, and the FDCPA generally forbids collectors from engaging in unfair, deceptive, or harassing behavior." *Kropelnicki v. Siegel*, 290 F.3d 118, 127 (2d Cir. 2002); *see also Vincent v. The Money Store*, 736 F.3d 88, 98 (2d Cir. 2013) ("Because the FDCPA is remedial in nature, its terms must be construed in liberal fashion."); *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1200 (11th Cir. 2010) ("Aside from the examples of violations provided within Section 1692f, the FDCPA does not purport to define what is meant by "unfair" or 'unconscionable.'"). In other words, the claims Mr. Rivera brings need not have been included in §1692f's list to be valid.

Furthermore, Nationstar's assertion that courts do not allow FDCPA claims in the context of mortgage servicing and loss mitigation actions is false. *See, e.g.*, *In re Dulaney*, 2016 WL 8223325, at *3 (Bankr. W.D. Ark. 2016) (allowing FDCPA claim against Nationstar alleging similar conduct to present case to survive motion to dismiss); s*ee also Gburek v. Litton Loan Servicing L.P.*, 614 F.3d 380, 384 (7th Cir. 2010) (applying FDCPA to discussions with mortgagor regarding repayment options); *Matmanivong v. Nat'l Creditors Connection, Inc*., 79 F. Supp. 3d 864 (N.D. Ill. 2015) (holding mortgage loan servicer was covered by FDCPA). As these cases show, Mr. Rivera's allegations are well within the boundaries of a reasonable FDCPA claim. Additionally, in *Gallego v. Northland Grp. Inc*., the Second Circuit noted that "[i]nnovative lawyers should not be deterred from advancing legal theories that neither we nor

the Supreme Court have authoritatively rejected by the risk of having their claims branded

'frivolous' . . . ." *Gallego v. Northland Grp. Inc.*, 814 F.3d 123, 128 (2d Cir. 2016). Mr. Rivera's

allegations are not likely to have been considered by a court because they concern Nationstar's

refusal to consider reducing his debt through a program that was only briefly available in 2016.

**VIII. Mr. Rivera Sufficiently Alleged a RESPA Claim Against Nationstar**

Nationstar's attempt to dismiss Mr. Rivera's RESPA claim should also be denied. On

December 27, 2017, Mr. Rivera mailed Nationstar a detailed qualified written request ("QWR").

*See* FAC, Ex. O. Mr. Rivera's QWR noted several errors related to the servicing of his loan since

2013 and requested appropriate relief. *See* FAC ¶¶ 122-124. Per the relevant regulations, Mr.

Rivera's QWR contained complaints related to Nationstar's "failure to accept a payment" in

December 2013 and in January 2014, 12 C.F.R. § 1024.35(b)(1), Nationstar's "failure to provide

accurate information . . . regarding loss mitigation options and foreclosure," *id*. at

§ 1024.35(b)(7), and Nationstar's "error[s] relating to the servicing of [his] loan," *id*. at

§ 1024.35(b)(11). Nationstar's response violated 12 C.F.R. § 1024.35(e) because it failed to

conduct a "reasonable investigation" into the matters raised in Mr. Rivera's QWR. By failing to

provide a "statement of reasons" for its determination that it did not make any errors with respect

to Mr. Rivera's accounts, Nationstar's response violated federal regulations enacted pursuant to

RESPA. *See* FAC ¶¶ 127-129; *see also Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241 (11th

Cir. 2016) (finding adequately pled RESPA violation on analogous facts). Mr. Rivera also

alleged that Nationstar has engaged in a "pattern or practice" of similar RESPA violations. *See*

FAC ¶ 130 (listing cases in other states); *see also Toone v. Wells Fargo Bank, N.A.*, 716 F.3d

516, 523 (10th Cir. 2013) (stating that pattern-and-practice violations may be inferred from a

defendant's conduct "with respect to other borrowers").

23

None of Nationstar's arguments against Mr. Rivera's RESPA claim hold up under scrutiny, especially at the motion to dismiss stage. Nationstar first compares Mr. Rivera's QWR to the QWRs at issue in *Sutton v. CitiMortgage, Inc.*, No. 16 Civ. 1778 (KPF), 2017 WL 122989 (S.D.N.Y. 2017), and contends that, like the plaintiff in *Sutton*, Mr. Rivera improperly attempted to use his QWR to "negotiate [his] loan modification." Def. Mot. Dismiss 46. However, *Sutton* held that the QWR failed to state a claim because it did not allege errors related to "standard servicer's duties." *Sutton*, 2017 WL 122989, at *10-11 (citing 26 U.S.C. § 2605(k)(1)(C)). The CFPB has interpreted "standard servicer's duties" to include "work[ing] with . . . borrowers on options to mitigate losses for defaulted mortgage loans." *Id.* (citing *Mortgage Servicing Rules under the Real Estate Settlement Procedures Act (Regulation X)*, 78 Fed. Reg. 10739 (February 14, 2013)). Since the *Sutton* plaintiff was not in default at the time she wrote her QWRs and she merely wanted to extend the term of her loan by writing QWRs to her servicer, that court held that the QWRs were not actionable under RESPA. Mr. Rivera's QWR, by contrast, did not constitute an attempt to engage in *ad hoc* modification negotiations. Rather, Mr. Rivera, who Nationstar has kept in default and in foreclosure during the entirety of this process, requested that Nationstar either fix its previous servicing errors or "timely review" him for further loss mitigation options, which Nationstar had failed to do for almost three years. *See* FAC, Ex. O. All of Mr. Rivera's alleged errors relate to "standard servicer's duties," and are therefore distinguishable from those at issue in *Sutton*.

Nationstar next claims that 12 C.F.R. § 1024.35, the corollary regulation to 12 U.S.C. § 2605(k)(1)(C), does not contain a private cause of action. The Court should reject this argument for the reasons set forth in *Sutton*, *supra*, 2017 WL 122989, at *12-13, and in *Lage v. Ocwen Loan Servicing*, 839 F.3d 1003, 1007 (11th Cir. 2016). Most notably, RESPA explicitly

provides a private right of action for "fail[ure] to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E) (emphasis added).

Nationstar further argues that Mr. Rivera cannot bring a claim under 12 C.F.R. § 1024.35 because 12 U.S.C. § 1024.41 is the only regulation that covers loss mitigation procedures. *See* Def. Mot. Dismiss 48-52. Again citing *Sutton*, Nationstar writes that 12 C.F.R. § 1024.35(b)(11)—the regulation's "catch all" provision for "any other error relating to the servicing of a borrower's loan"—does not "encompass errors in loss mitigation decisions." *Sutton*, *supra*, 2017 WL 122989, at *14-*15. But Mr. Rivera's claim relates to a failure to reasonably investigate allegations raised in his QWR. These allegations revolve around a failure to accept a payment, a faulty breach of an already-agreed-upon modification, and continual failures to even consider Mr. Rivera for loss mitigation options. *See* FAC ¶ 124. Mr. Rivera's grievances have nothing to do with the loss mitigation application procedures outlined in 12 C.F.R. § 1024.41. Moreover, the CFPB explicitly wrote that the servicer errors covered by 12 C.F.R. § 1024.35's "catch all" provision involve the same "standard servicer duties" discussed above with respect to 26 U.S.C. § 2605(k)(1)(C). *See Mortgage Servicing Rule*, 78 Fed. Reg. 10744 ("The Bureau believes that any error related to the servicing of a borrower's mortgage loan also relates to standard servicer duties."). Unlike the plaintiff in *Sutton*, Mr. Rivera's QWR alleged violations of these duties.

Nationstar also contends that Mr. Rivera has not alleged how Nationstar's failure to adequately respond to his QWR "proximately caused" damages. Def. Mot. Dismiss 52. Yet Mr. Rivera's complaint specifically alleged a connection between Nationstar's "failure to correct the[] errors" asserted in the QWR and the elevated interest rate on his uncorrected loan. FAC ¶

131. These damages continued to accrue between Nationstar's inadequate response to Mr. Rivera's QWR on January 27, 2017 and the filing of his FAC on March 9, 2017.

Finally, Nationstar claims that it undertook a "reasonable investigation" into the errors raised in Mr. Rivera's QWR and that it provided a sufficient "statement of reasons" for its decisions. Def. Mot. Dismiss 54. But Nationstar bases this argument on its own interpretation of what a "reasonable" investigation should look like. On a motion to dismiss, Nationstar's interpretation of a "reasonable investigation" is not entitled to greater deference than Mr. Rivera's. *See Renfroe*, *supra*, 822 F.3d at 1245 (noting that Nationstar made "dangerous argument" on 12(b)(6) motion when it claimed that courts "should elevate [Nationstar's] conclusions" over plaintiff's allegations). Mr. Rivera properly alleged that Nationstar's determination that he authorized an automatic debit payment three years ago did not follow from a "reasonable investigation" because Nationstar admitted that it did not have records of the calls where he allegedly made such an authorization. *See* FAC ¶ 127. Mr. Rivera's allegations also show that he did not think a "reasonable investigation" took place when Nationstar based its summary refusal to review him for a Freddie Mac Principal Reduction program—a program that he informed Nationstar about several times—on the conclusory statement that "qualified customers were notified." *Id.* at ¶ 129; *see also id*. at ¶ 36 (further explaining Nationstar's failure to review Mr. Rivera for the program). Because Mr. Rivera has plausibly pled a RESPA violation under 26 U.S.C. § 2605(k)(1)(C) and 12 C.F.R. § 1024.35(e), this Court should deny Nationstar's motion to dismiss Mr. Rivera's RESPA claim.

## IX. Mr. Rivera's CUTPA, Negligence, NIED, and FDCPA Claims Are Timely

Mr. Rivera initiated this action on January 11, 2017 and complains of tortious activity that began in December 2013 and continued until at least February 2017. Nationstar nevertheless asserts that Mr. Rivera's CUTPA claims are time-barred due to a three-year statute of limitations

and that his negligence and NIED claims are time-barred by a two-year statute of limitations. *See* Def. Mot. Dismiss 11. However, Mr. Rivera's CUTPA, negligence, and NIED claims are based on Nationstar's continuing course of negligent and unfair conduct, conduct which continued well after Nationstar unlawfully rescinded Mr. Rivera's HAMP modification in January 2014. Moreover, his FDCPA claim is based entirely on misconduct that occurred after January 11, 2016. Accordingly, these claims are timely.

As a threshold matter, expiration of a "statute of limitations is an affirmative defense, and therefore generally not appropriate for a motion to dismiss." *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, No. 3:11–CV–282 (JCH), 2012 WL 162361, at *3 (D. Conn. 2012). This is because a "[s]tatute of limitations analysis is generally riddled with questions of fact which *the Defendants* must establish in order to bar Plaintiffs' claims." *Bartold v. Wells Fargo, N.A.*, No. 14-cv-00865 (VAB), 2015 WL 7458504, at *4 (D. Conn. 2015) (citation omitted) (emphasis in original). It is only appropriate as grounds for a motion to dismiss "if the running of the statute is apparent from the face of the complaint." *Velez v. City of New London*, 903 F. Supp. 286, 289 (D. Conn. 1995) (internal citation omitted). That is not the case here. Mr. Rivera has plausibly alleged that the conduct that gave rise to his CUTPA, negligence, and NIED claims has been ongoing from December 2013 until after the complaint was served. For this reason alone, these claims should not be dismissed.

### 1. Mr. Rivera Has Sufficiently Pled That the Continuing Course of Conduct Doctrine Tolls the Statute of Limitations for CUTPA Violations

CUTPA's three-year statute of limitations can be tolled when the defendant has engaged in a continuing course of conduct. *See Vanliner Ins. Co. v. Fay*, 98 Conn. App. 125, 140 (2006); *In re Kellogg*, 166 B.R. 504, 507-08 (Bankr. D. Conn. 1994). To support a finding of a continuing course of conduct, two requirements must be met: (1) "the defendant must have

committed an initial wrong upon the plaintiff"; and (2) "there must be evidence of a breach of a duty that remained in existence after commission of the original wrong." *Flannery v. Singer Asset Fin. Co., LLC*, 312 Conn. 286, 312 (2014). A plaintiff can satisfy the second requirement "when there was wrongful conduct of [the] defendant related to the prior act." *Id*. Furthermore, "[t]hat continuing wrongful conduct may include acts of omission as well as affirmative acts of misconduct." *Vanliner Ins. Co.*, *supra*, 98 Conn. App. at 140.

Mr. Rivera has pled sufficient facts under CUTPA to meet both of requirements. He alleged that Nationstar negligently and unfairly refused to accept his final trial plan payment and then rescinded his HAMP modification agreement as a result. *See* FAC ¶¶ 27, 43-45, 53, 84. This action by Nationstar, in which it terminated a fully executed agreement because it negligently failed to accept a proffered payment from Mr. Rivera, is the "initial wrong." Furthermore, by rescinding the fully executed HAMP agreement for this reason, Mr. Rivera alleged Nationstar breached its contractual duty to abide by all the terms of the signed and completed agreement. *See id.* at ¶¶ 43-45, 53, 84. Although Nationstar offered Mr. Rivera a different, less desirable loan modification in February 2017, its continued refusal to recognize the fully-executed HAMP agreement as valid means that the breach continues to this day. Thus, the statute of limitations on Mr. Rivera's CUTPA claim still has not begun to run and is not time-barred.

Moreover, following its wrongful rescission of the fully executed HAMP loan modification, Nationstar committed several later acts of misconduct directly related to the rescission. *See, e.g.*, *id.* at ¶¶ 31, 33-36, 54, 67-70, 75-78, 80, 84; *Bartold*, *supra*, 2015 WL 7458504, at *5 (denying defendant mortgage lender's motion to dismiss plaintiff borrower's CUTPA claim based on the statute of limitations because plaintiff "alleged later wrongful acts related to the alleged deceptive acts occurring prior to the limitations period"). For example,

28

since Nationstar rescinded the modification, it has continued to require Mr. Rivera to pay an amount on his mortgage that was far higher than what should have been required. *See id.* at ¶¶ 54, 84. Moreover, after withdrawing its foreclosure action against Mr. Rivera in February 2014, Nationstar commenced a new foreclosure action against him in June 2014. In this second foreclosure, Nationstar levied additional (and unnecessary) costs and fees on him. *See id.* at ¶¶ 31, 48, 54, 84. Nationstar engaged in further misconduct by failing to mediate in good faith during the ensuing foreclosure mediations sessions, which took place from October 2014 through January 2017. *See id.* at ¶¶ 33-36, 67, 84. During mediation, Nationstar repeatedly argued that Mr. Rivera was ineligible to receive a HAMP modification because he "defaulted" on the initial HAMP trial plan, despite receiving evidence to the contrary at multiple points during the mediation process. *Id.* Each of these "later wrongful acts" are related to Nationstar's erroneous rescission of Mr. Rivera's HAMP modification, demonstrating that the continuing course of conduct doctrine tolls the statute of limitations for his CUTPA claim.

Furthermore, even if this Court does not find that the continuing course of conduct tolls the statute of limitations for Mr. Rivera's CUTPA claim, the claim is still timely. If not tolled by a continuing course of conduct, the statute of limitations on Mr. Rivera's CUTPA claim began running when he discovered that Nationstar rescinded the fully executed HAMP modification. Mr. Rivera was first made aware of the rescission when he called Nationstar in January 2014 to make his first mortgage payment under the agreement. *See* FAC ¶ 27. The complaint does not include the exact day in which Mr. Rivera made the call, and could be any day during that month. If it was January 11, 2014 or later, then it was less than three years before the complaint was filed, and Mr. Rivera's entire CUTPA claim is timely regardless of whether it was based on a continuing course of conduct. Additionally, Mr. Rivera alleged that Nationstar committed new,

separate unfair and deceptive acts from 2014 to 2017. For instance, Nationstar failed to review

Mr. Rivera for non-HAMP modification options for which he was eligible, including a limited-

time-only principal reduction offer, despite repeatedly being notified by the Court Mediator of

Mr. Rivera's eligibility for such programs. *See id.* at ¶¶ 35-36, 67, 84. These acts occurred

between October 2014 and January 2017, and thus are also not barred even if the continuing

course of conduct doctrine does not toll the statute of limitations. *See* Conn. Gen. Stat. § 42-

110g(f).

Based on the foregoing, Mr. Rivera's allegations are sufficient to show, at this stage, that

his CUTPA claim should not be dismissed because of the applicable statute of limitations.

## 2.  Mr. Rivera Has Sufficiently Pled That the Continuing Course of Conduct Doctrine Tolls the Statute of Limitations for his Negligence and NIED Claims

As with CUTPA violations, the Connecticut Supreme Court "has recognized the

continuing course of conduct doctrine in many cases involving claims sounding in negligence."

*Watts v. Chittenden*, 301 Conn. 575,583(2011); *see also Aldi v. Wells Fargo Bank, N.A.*, No.

3:14–cv–00089–WWE, 2015 WL 3650297 (D. Conn. 2015) (finding that the continuing course

of conduct doctrine tolled mortgage borrowers' negligent misrepresentation claim). The

requirements for finding that a continuing course of conduct tolls the statute of limitations for

negligence-based claims are the same as for CUPTA violations. *Chittenden*, *supra*, 301 Conn. at

585.

Mr. Rivera has sufficiently alleged facts fulfilling these requirements. He alleged that

Nationstar was not only negligent in its wrongful rescission of the fully executed HAMP loan

modification in January 2014, but also in its subsequent, ongoing failure to acknowledge its

mistake and reinstate the HAMP modification, and in its failure to honestly and accurately

review Mr. Rivera's eligibility for other modification options during the foreclosure mediation

process. *See* FAC ¶¶ 66-80. Therefore, Mr. Rivera has alleged several "later wrongful act[s] related to the prior act" of Nationstar's negligent rescission of his fully-executed HAMP modification. *Aldi*, *supra*, 2015 WL 3650297, at *3. Accordingly, the continuing course of conduct doctrine tolls the statute of limitations for Mr. Rivera's negligence claims until well after January 11, 2015, and these claims cannot be dismissed on this basis.

Nationstar's negligent infliction of emotional distress has also been ongoing throughout the foreclosure and mediation process. When Nationstar refused to accept Mr. Rivera's first modified loan payment in January 2014 and rescinded his permanent modification, Mr. Rivera alleged he became distressed by the possibility of losing his longtime family home and uprooting his children's lives. *See* FAC ¶ 104. The emotional distress caused by these actions continued through at least February 2017, when Nationstar finally offered Mr. Rivera a loan modification, albeit one with worse terms than the wrongfully rescinded HAMP modification. For instance, in June 2014, Nationstar exacerbated the emotional distress Mr. Rivera experienced as a result of its wrongful rescission of the permanent HAMP modification by initiating a foreclosure action against him. *See id.* at ¶ 101. It also worsened Mr. Rivera's emotional distress by having representatives repeatedly show up at his home and take photographs from June 2013 until December 2014, which alarmed and invaded the privacy of both Mr. Rivera and his three children. *See id.* at ¶ 102. Moreover, from October 2014 until January 2017, Nationstar added to Mr. Rivera's emotional distress by failing to mediate in good faith and review Mr. Rivera for other modification options for which he was eligible. *See id.* at ¶ 106. These actions, which caused Mr. Rivera to experience multiple severe health issues, *see id.* at ¶¶ 109-12, were all related to Nationstar's initial wrongful act of refusing Mr. Rivera's final trial plan payment and rescinding his HAMP modification. *See Aldi*, *supra*, 2015 WL 3650297, at *3. Accordingly, the

continuing course of conduct doctrine tolled the statute of limitations for Mr. Rivera's NIED claims until after January 11, 2015 as well, and these claims also cannot be dismissed on this basis.

### 3. Mr. Rivera's FDCPA Claim Is Within the Applicable Statute of Limitations

Mr. Rivera's FDCPA claim is timely because it is based entirely on actions that occurred after January 11, 2016. *See* FAC ¶ 118. First, Mr. Rivera alleged Nationstar violated the FDCPA by refusing "to recognize the fully executed permanent HAMP modification agreement" that it wrongfully rescinded. *Id.* at ¶ 118(a). Nationstar refused to recognize the HAMP modification agreement throughout the relevant period, and thus the statute of limitations has not begun to run on that violation. *See* Section IX.A, *supra*. Nationstar committed every other act on which Mr. Rivera bases his FDCPA claim during the years 2016 and 2017. *See* FAC ¶ 118(b-g). Therefore, none of the conduct on which Mr. Rivera bases his FDCPA claim falls outside of the applicable statute of limitations. *See* 15 U.S.C. § 1692k(d).

Nationstar nonetheless argues that Mr. Rivera's FDCPA claim is "time barred" because "the alleged conduct is founded in conduct surrounding the TPP and HAMP modification agreement" and the foreclosure mediation sessions Mr. Rivera uses to support his FDCPA claim "are based on conduct from 2013." Def. Mot. Dismiss 14. Neither assertion is true. Nationstar's conduct during the foreclosure mediation sessions is not "founded in" or "based on" any prior conduct. Mr. Rivera alleged that Nationstar's conduct during these sessions, independent of any previous conduct in its relationship with Mr. Rivera, violated the FDCPA. *See* FAC ¶ 118. That Nationstar committed earlier acts of misconduct against Mr. Rivera, acts on which Mr. Rivera does not base his FDCPA claim, is irrelevant to whether his FDCPA claim is timely.

**X. Mr. Rivera Can Rely on Nationstar's Behavior During the Court-Supervised Foreclosure Mediation Process to Support his Claims**

Nationstar argues that Mr. Rivera cannot support his claims with statements made during Connecticut's Foreclosure Mediation Program ("FMP") because such statements are inadmissible. Def. Mot. Dismiss 16. This evidentiary argument is misplaced in a motion to dismiss, where all material allegations in the complaint are assumed to be true. *See Twombly*, *supra*, 550 U.S. at 570. Moreover, even if this argument were appropriate at this stage, a plain reading of the applicable rules of evidence shows that such statements are admissible. Under the Federal Rules of Evidence, statements or conduct that occurred during mediation are not barred from being used to support a plaintiff's claims unless they specifically contemplate those claims. *See Henderson v. Wells Fargo Bank*, No. 3:13cv378 (JBA), 2017 WL 731780 (D. Conn. 2017) (citing Fed R. Evid. 408). As this Court has noted, to be excluded under the Rules, such statements or conduct must not only be offered "to prove or disprove the validity of a disputed claim," but must consist of efforts between the parties to resolve the disputed claims. *Id*. Here, the disputed claims are Mr. Rivera's breach of contract, promissory estoppel, negligence, NIED, CUTPA, FDCPA, and RESPA claims. Conduct and statements made during foreclosure mediation sessions between October 2014 and January 2017 could not possibly have concerned these claims because Mr. Rivera did not bring this action until after those mediation sessions were held. Thus, Nationstar's conduct or statements during the foreclosure mediation sessions cannot be excluded on this basis.

Moreover, because foreclosure mediation sessions are public matters subject to disclosure, Mr. Rivera may use evidence from these sessions to support his claims. Unlike traditional mediation and other types of compromise negotiations, parties and mediators often publicly divulge details about the substance of foreclosure mediation sessions in filings and

33

during hearings. For instance, the FMP requires mediators to file detailed reports after each mediation session concerning the parties' progress toward resolution. Conn. Gen. Stat. § 49-31n(c)(2). Parties may file supplemental reports concerning foreclosure mediation discussions. Conn. Gen. Stat. § 49-31(c)(2). Furthermore, good cause is required to extend or terminate mediation before or after the initial period ends, and demonstrating good cause requires divulging the substance of mediations. Conn. Gen. Stat. § 49-31n(c)(1). Indeed, unlike traditional mediation and settlement negotiations, the FMP is characterized in large part by its transparency.

The only aspects of the foreclosure mediation process deemed statutorily confidential are those that concern sensitive financial information of the mortgagor. Conn. Gen. Stat. § 49-311(c)(3). Because the Connecticut legislature has only specified these areas of the foreclosure mediation process as confidential, anything else that stems from the process is not confidential and properly admissible. This comports with the general theory of legislative intent. *See Asylum Hill Problem Solving Revitalization Assn. v. King*, 277 Conn. 238, 256-57 (2006) (when "a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed . . . .") (internal quotation marks omitted). None of Nationstar's conduct during foreclosure mediation sessions that Mr. Rivera uses to support his claims concerns his sensitive financial information. Moreover, this conduct has already been documented in the mediator's session reports, which are posted on the Connecticut Judicial Branch's public website. Accordingly, this conduct, which is not excludable under the Federal Rules of Evidence, is not otherwise confidential. Mr. Rivera may therefore use it to support his claims.

Nationstar nonetheless argues that its conduct during foreclosure mediation sessions is not admissible, relying on authority expressing the sentiment that admitting attempts at

settlement into evidence offends public policy. *See Miko v. Comm'n on Human Rights & Opportunities*, 222 Conn. 192 (1991); *Bank of New York Mellon v. Cutone*, No. MMX-CV12-600875, 2015 WL 6242960 (Conn. Super. Ct. 2015). These cases are inapposite. *Miko* dealt with the admission of settlement and conciliation efforts that were statutorily prohibited from being received into evidence. *See* Conn. Gen. Stat. § 46a–84(e) (1987). The CHRO investigators in that case were expressly prohibited from discussing what occurred during settlement and conciliation efforts. *See* Conn. Gen. Stat. § 46a–83(b) (1987). This is not so for foreclosure mediation, where mediators are required to disclose information regarding what occurred during mediation sessions.

Furthermore, because none of the information Mr. Rivera relied on is confidential, admitting it as evidence will not have a "chilling effect on the mortgage industry." *See Cutone*, *supra*, 2015 WL 6242960, at *5 (Conn. Super. Ct. 2015). Moreover, *Cutone* foresees this "chilling effect" if such information were used to "vitiate" a defendant's underlying default. *Id*. Mr. Rivera is not using the mediation discussions to challenge his underlying default. Instead, he is seeking specific performance and damages arising in part from Nationstar's negligent and unfair conduct during mediation. Accordingly, the *Miko* and *Cutone* decisions and the public policy they announce are irrelevant to whether publicly documented conduct from foreclosure mediation sessions can support Mr. Rivera's claims in a separate, affirmative action.

Nationstar also makes the misleading claim that "[f]oreclosure mediation is meant to assist in resolving litigation, not to create additional litigation." Def. Mot. Dismiss 18. The objective of foreclosure mediation is to see if the parties "can reach an agreement that will (i) avoid foreclosure by means that may include consideration of any loss mitigation options available through the mortgagee, or (ii) expedite or facilitate the foreclosure in a manner

35

acceptable to the parties." Conn. Gen. Stat. § 49-31(k)(7). Foreclosure mediation is not intended to resolve disputed claims or defenses as settlement talks do. Furthermore, foreclosure mediation would have resolved this litigation if not for Nationstar's actions before, during, and after the mediation process. Had Nationstar conducted itself fairly and equitably from the outset, this "additional" litigation would not exist. Nationstar should not be able to escape accountability for its negligent and damaging actions by leaning on public policy that it itself undermined throughout the foreclosure mediation process.

## XI. Corrie Rivera is Not a Necessary Party to This Action

Finally, Nationstar argues that Mr. Rivera's former wife, Corrie Rivera, is a necessary and indispensable party to the action pursuant to Fed. R. Civ. P. 19. Because Corrie Rivera and Mr. Rivera divorced, Corrie Rivera obtained a discharge of the debt at issue, and she quitclaimed the property to Mr. Rivera prior to the conduct at issue in this action, she is not a necessary party. In the event that the Court finds otherwise, Mr. Rivera asks that Nationstar's Motion to Dismiss on this ground be denied because joinder is feasible.

"Fed. R. Civ. P. 19 sets forth a two-step test for determining whether the court must dismiss an action for failure to join an indispensable party. First, the court must determine whether . . . the party qualifies as a 'necessary' party under Rule 19(a)." *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000). Rule 19(a) states that a party is necessary where:

> (1) In the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. *Id.*

If a party is not found to be necessary pursuant to Rule 19(a), the court need not decide whether the case must be dismissed for failure to join an indispensable party under Rule 19(b). *Id.*

Corrie Rivera is not a necessary party to this action. She and Mr. Rivera divorced in January 2010, *see Reinaldo Rivera v. Corrie A. Rivera*, No. NNI-FA09-4012216-S (Conn. Super. Ct. 2009), and she quitclaimed the property to Mr. Rivera in February 2010, *see* Exhibit A. As described in the complaint and as may be gleaned from public record, Corrie Rivera no longer resides at the property. *See* FAC ¶ 9; Appearance of Corrie Rivera, *Nationstar Mortgage LLC v. Rivera*, No. NNH-CV14-6047477-S (Conn. Super. Ct. 2014) (reflecting Corrie Rivera's representation to the Court that she resides at 77 Colonial Heights in Meriden, Connecticut as of June 17, 2014). Furthermore, she has no personal liability for the loan at issue because she filed Chapter 7 bankruptcy in March 2014 and received a discharge with respect to the loan. *See In re Corrie Rivera*, 14-BK-30488 (Bankr. D. Conn. 2014).

While Nationstar points out that Corrie Rivera filed an appearance in the State Court foreclosure action and that she signed the HAMP modification attached to Mr. Rivera's complaint, these facts are not dispositive of the question at issue. "Courts have repeatedly cautioned . . . that the Rule 19 inquiry is a fact specific and practical one, which 'should not be based on formalistic or mechanistic grounds but rather on pragmatic analysis of the effect of a potential party's absence.'" *Southeastern Sheet Metal Joint Apprenticeship Training Fund v. Barsuli*, 950 F. Supp. 1406, 1414 (E.D. Wis. 1997); *see also CFI of Wis., Inc. v. Hartford Fire Ins. Co.*, 230 F.R.D. 552, 554 (W.D. Wis. 2005); *Aetna Casualty & Surety Co. v. Namrod Dev. Corp.*, 140 B.R. 56, 61 (S.D.N.Y. 1992). Because Corrie Rivera relinquished her claim to the property and does not reside there, her absence from the instant action will have no bearing on the court's ability to accord complete relief among the parties. Mr. Rivera requests damages and specific performance of the original 2013 HAMP agreement as relief in this action. *See* FAC ¶¶ 34-35. Any reduction of the debt that Mr. Rivera owes to Nationstar would not affect Corrie

Rivera in any way because she no longer has any personal liability for the mortgage and because she no longer owns the property at issue. Similarly, specific performance of the HAMP modification agreement would not affect Corrie Rivera's legal relationship to the property or the mortgage loan. Therefore, Nationstar will suffer no adverse effect from Corrie Rivera's absence.

Nationstar also argues that Corrie Rivera could "institute the same claims [that Mr. Rivera brings here] at a later date [after Mr. Rivera or Nationstar has won] due to her execution of the documents that are the subject of the action." Def. Mot. Dismiss 10. Corrie Rivera has no basis for bringing the same claims as Mr. Rivera at a later date, however, because she has no interest in the property (as she no longer owns the property nor resides there), and because she has no personal liability for the mortgage loan (as she received a discharge with respect to the loan at issue in this case through her Chapter 7 bankruptcy), *Johnson v. Home State Bank*, 501 U.S. 78, 82 (1991). Disposition of the action in her absence will not "impede or impair" her ability to protect her interest, nor will it subject Nationstar to the risk of incurring multiple lawsuits.

## 1. Even If the Court Finds That She Is a Necessary Party, Nationstar's Motion to Dismiss Must Be Denied Because Joinder Is Feasible

Even if the Court finds that Corrie Rivera is a necessary party, the Court need not proceed to the second step of the Rule 19 analysis—determining whether she is an indispensable party—because it would be feasible to join her to the action. "[I]f an absent party satisfies the Rule 19(a) standard, a court must next assess the feasibility of joinder before . . . determin[ing] whether the party is 'indispensable.'" *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000). There is no evidence suggesting that Corrie Rivera cannot be made a party to this action. Her joinder would not deprive the court of subject matter jurisdiction, as complete diversity of citizenship between the parties would be maintained given her citizenship in Connecticut. *See*

Appearance of Corrie Rivera, *Nationstar Mortgage v. Rivera*, No. NNH-CV14-6047477-S

(Conn. Super. Ct. 2014). Accordingly, even if the Court decides that Corrie Rivera is a necessary

party, Nationstar's motion to dismiss on this ground must be denied. *See McKeon v. Guardian*

*Ins. & Annuity Co.*, No. 3:07–cv–425 (WWE), 2007 WL 4169115, at *3 (D. Conn. 2007)

(denying defendant's motion to dismiss for failure to join an indispensable party because joinder

was feasible).

## **CONCLUSION**

For the forgoing reasons, Mr. Rivera respectfully requests that the Court deny

Nationstar's 12(b)(6) and 12(b)(7) motion to dismiss.

Respectfully Submitted,

THE PLAINTIFF
REINALDO RIVERA

By:          /s/ *Jeffrey Gentes*

On the Opposition:                          Jeffrey Gentes (ct28561)
P. Solange Hilfinger-Pardo                  Jerome N. Frank Legal Service Organization
Yale Law School '17                         Yale Law School
Law Student Intern                          127 Wall Street
                                            New Haven, CT  06511
Noah Kolbi-Molinas                          Tel.: (203) 432-4800
Yale Law School '18                         Fax: (203) 432-1426
Law Student Intern                          jeffrey.gentes@ylsclinics.org

Anderson Tuggle
Yale Law School '18
Law Student Intern

Emily Wanger
Yale Law School '18
Law Student Intern

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2017 a copy of the foregoing was filed and served electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

By: _____ /s/ _____
         Jeffrey Gentes